Santos. May it please the Court, my name is Santhosh Arvind and I represent the claimant appellant, Eric Silva-Santos. When Congress enacted the Fugitive Disentitlement Act, it provided that the ultimate decision whether to order disentitlement rested in the sound discretion of the trial court. If there is a case that calls for the exercise of that discretion in finding that a claimant is not a disentitled fugitive, this is the case. This case represents an unprecedented use of the civil forfeiture laws by the government and how Mr. Silva was prevented from challenging that use. Here the property the government is seeking forfeiture of is located in Bermuda. The claimant is a Mexican citizen who is living in Mexico. The underlying criminal violations for the civil forfeiture action are crimes against Mexico. And also crimes against the United States. Well, Your Honor, that's correct, insofar as the trial court found that the crimes against the foreign nation were premised on money laundering violations. Well, I mean, nobody is challenging the fact that the indictment states a claim, a claim over which the United States courts have jurisdiction with respect to the criminal acts that are alleged, mail fraud, money laundering and so on. That's correct, Judge Jotley. But at the same time, the underlying premise of the civil forfeiture action is a crime against Mexico. And in the context of this case, which is the application of the Fugitive Disentitlement Statute. I mean, it's a crime against the United States as well, I mean, the forfeiture as well, I mean, is it not? What happened in this case is the – I understand, I mean, the underlying facts that give rise to, I mean, the corruption, the alleged corruption that tanks the funds occurred in Mexico. Correct. I agree with that. But beyond that, the United States has jurisdiction and has an interest and so on in the remaining part of the case. The question, I think, for this Court is in terms of the policy considerations, the active state doctrine and comedy, is how do those interests of the United States measure to the interests of Mexico? And in this case – Well, and then we get – you're arresting solely, it seems to me, on the Mexican documents that you furnished to indicate, to support your state of – active state and your international comedy arguments. And the district court dismissed those immediately, and that they were vague, non-supportive of any kind of active state because there were no – there's no active state involved in it. And there was no international comedy involved in it because it was nothing but statements, essentially that there was no evidence that your man was a crook, the – by the Attorney General of the state. So, I mean, that's – is that an act of the state, the opinion of the Attorney General that your man is not a crook? I mean, that there's no evidence. He didn't even say that. He said there's no evidence that he's a crook. Well, Your Honor, we believe it is an act of state because an act of state talks about any sort of determination, whether it's – There was no determination here of any kind, except that, as you say, he hadn't been proved a crook in Mexico. Well, the – They didn't even say he'd ever tried to prove him. He had not even come to court. I mean, the district court, I mean, just blew away the evidence that you have that support act of state and international comedy. Isn't that correct? I agree that the district court disregarded them summarily and did not really look at – And why shouldn't it? And why shouldn't it? Where is the act of state? I mean, do you question that documents, or essentially the documents of the attorney general of the particular state in Mexico – Tamaulipas. And that the documents say nothing more than there is no evidence of political corruption on the part of the defendant here? Did it say any more than that? The documents say that Mr. Silva is not being investigated, has not committed a crime, in connection with his time as the mayor of Tamaulipas. There's no evidence of it. That's correct. And we submit that that is, in fact, an act of state. It does go to the comedy commissions because it's – The state is saying we enacted. That's correct. It's a determination by the Mexican legal authorities. It's a determination. What determination? That there's no evidence? It's a determination that this individual has not – is not being investigated. Well, that's just an observation, though, isn't it? You stated there's been no investigation and there's been no conviction. That's not a determination. That's just a statement of the condition of things. It's an observation, isn't it? I agree that it's an observation, Judge Graves. But at the same time, in the context of this case, which is the government's repeated refusal to provide any discovery, any documents, in support of their forfeiture allegations. Mr. Silva – Is that true? Are there two witnesses that did support the illegality of his conduct? There is an affidavit that was submitted by Special Agent Lyons and an affidavit that was submitted by another agent. One of those affidavits was submitted under seal. And the only indication in the record is that it talked about a credible fear as to the witnesses. We haven't seen that document. We have no idea what it says. All we have before us – and Special Agent Lyons' affidavit talks nothing about the specifics of the case, specific evidence. All it says is, we talked to some witnesses, and that's all it says. The complaint, whether it's the original complaint or the amended verified complaint, has no details as to the evidence. There's no meat on the bones. And Mr. Silva repeatedly asked for evidence in the criminal case as well as the civil case, asked for evidence, and was rebuffed by that. If you recall in the record, Mr. Silva's common-law spouse, Maria Castaneda Torres, had a claim to a residence in Brownsville. The government decided to non-suit that residence in an effort to avoid giving her discovery to which she was entitled. The government promised to the court in the initial proceedings, when the court entered a disentitlement order, that it had witnesses, it had documents. And based on those representations, I think it's fair to say from the court's order that the court ordered disentitlement. At the end of the day, we have seen nothing. And because of that, Mr. Silva, on reconsideration, went and collected these documents. He did what I think any good person who believes he's innocent, who is charged with crimes, he provided documentary evidence to the court. Let me ask you how that fits into your concession that all the requirements for imposing the, what do you call it? Fugitive disentitlement. Yes, disentitlement. The disentitlement program are present in this case. That's correct. But we are not conceding that any of those statutory factors have not been met here. But again, the ultimate discretion lies with the district court. And here, given the unique factual circumstances, the existence of government overreach, we submit that a court should have looked at Mr. Silva's evidence. But aren't you, when you make that concession that all the requirements are here for the district court to act, you're saying the court did not act illegally and consequently, if he didn't act illegally, there's no abuse of discretion, unless you rely upon your documents from the Attorney General of that particular state. So it all boils down to the Mexican documents. I think the Mexican documents are a very critical point to this, Your Honor, especially in the context of the government not providing any discovery whatsoever. The Citigroup case, which is the Eastern District of New York case, talks about existence of government overreach as being one factor that could be at play in terms of making that discretionary decision whether or not to order disentitlement. And here there is an existence of government overreach. Here there is the existence of the government refusing to provide discovery despite Mr. Silva and Mr. Silva's common-law spouse's repeated demands for that discovery. So, and... But all that has got to amount to an abuse of discretion on the part of the district court here for not ruling in your favor. That's correct. This is, we admit that this is an abuse of discretion issue with respect to the determination of fugitive disentitlement. We also submit that the court erred by entering a default judgment by after he disentitled... Yeah, but that, we don't even get to that if we, we've got to, what we've got to find is that the district court abused its discretion with respect to disentitlement before we can even reach your default judgment arguments. That's correct, Judge Jolly. The threshold issue is whether the district court abused its discretion. And that basically relies upon whether he misread and was unfair in his characterization and interpretation of the Mexican documents. I think the Mexican documents is a part of it, and I think the other part of it is looking at this unprecedented use of the civil forfeiture laws. And looking at this case, that we have not found a single authority... Yeah, but you've conceded that all of the, on the other hand, you're faced with the concession that all of the requirements for imposing this law have been met. That is absolutely correct, Your Honor. And we are not challenging that in a lot of... You've got a difficult case. I mean, I'm not trying to give you a hard time about it, but I mean, you're doing the best you can with what you have. We're trying to. I'm trying to judge. But I think what we are trying to do, quite simply, is thread a needle. And the needle is that Congress has said that a district court has the ultimate discretion whether or not to order fugitive disentitlement. And apart from the statutory factors, which we are conceding, if you read the district court's opinion, both the original opinion and the order for reconsideration, he just summarily dismisses the arguments. He summarily dismisses the comedy grounds. He summarily dismisses the act of state. He essentially just rubber-stamps the government's applications with respect to both of those orders. And we would submit that if a court is... that the judge claim should have looked at the interests of Mexico compared to the interests of the United States. What I want to give you an opportunity to do without my continuing to interrupt you is because I... Why did the district court, or how did the district court, abuse its discretion in its interpretation of these Mexican documents? Because if you can't overcome that, you've lost your case, in my view. I think what the Mexican documents say is that Mr. Silva met all the election requirements in connection with his campaign for mayor. Said that his campaign was transparent, that there was no misuse of public funds, which is essentially the allegation that's been brought in the complaint. That the public accounts as the mayor contain no irregularities. He's filed tax returns, he's been in good standing, that there is no criminal record, and there is no charges of wrongdoing or pending or open investigations of wrongdoing. So what does that tell us? What it tells us is that the Mexican legal authorities have looked at Mr. Silva and determined that he has committed nothing wrong. And the comedy factors require a district court to look at the interests of the United States versus the interests of Mexico. If the court would indulge me in a hypothetical, Brownsville is right across the border from Mountain Views. And if the Mexican legal authorities had decided to indict the mayor of Brownsville, had said he's engaged in public corruption, had decided to forfeit some property belonging to that mayor, wouldn't this court, wouldn't we believe that those are uniquely American interests? We have an American mayor, an American citizen, we have a violation of American laws. This is the quintessential question about overreach and an overextension of the civil forfeiture laws. And precisely the question here is what laws did he allegedly violate? These are violations of the laws not even of Mexico, against Mexico. Because they are focused on public corruption as to his time as mayor of a city. And I think if the shoe was on the other foot, we would say that these are uniquely American interests and it should be it should be American legal authorities making those prosecution decisions. And that's why we believe that the district court abuses discretion. Thank you, Mr. Arvin. We will hear now from the United States. Ms. Smith. Is it Smith or Smythe? It's Smythe, Your Honor. May it please the Court. Mary Ellen Smythe of the United States. The underlying premise of the Fugitive Compatibility Doctrine under historically common law or now under its codification 28-2466 is a criminal fugitive has demonstrated such disrespect for the processes of the United States that it should be precluded from engaging further the resources of this court, any court, to further its interest in forfeiture. And yet, here we are today and he is not. I submit to Your Honor that this case, including this instant appeal, has never been about the district court's application of fugitive's entitlement or the correctness of a default judgment but rather the quest for Mr. Silva of the government's evidence against him. He was disentitled on the eve he was anticipating discovery responses by the government. He never got that information. So what happened was is he then was disentitled and he was disentitled when he was disentitled that creates a presumption and this is the key to disentitlement. It goes back all the way to Hammond-Packing versus Arkansas that the fugitive, it's a self-created presumption that the fugitive's claim has no merit. He's abandoned any defense to forfeiture that he may have. So in this particular case, after Mr. Silva had been disentitled by the court not having challenged the statute of rights. Put it another way, he's guilty as charged. He basically what it is, it's a presumption where he admits to the government's facts and it dovetails into the Rule 55 default. If he's guilty as charged, he'd be better to defend himself. I mean, that's the whole basis. That's the whole basis of it. So in order to circumvent this presumption, and in order to attempt to continue to engage the court to obtain evidence from the United States, he came up with three arguments. Now, he had already been disentitled, so he's asking the court and it's abuse of discretion of the courts not reconsidering its finding of disentitlement. So he had already been found disentitled when he presented these three arguments to the district court. And again, the court has correctly found that these three arguments, the weakness of the government's case based upon the Mexican documents, the principles of international comity based upon the documents, and the act of state. He says you presented, that the government presented no evidence other than the complaint itself, and it had no basis upon which to say that these funds were tainted. And he bases that on his statement relates back again to the documents that he obtained. So in order for, I mean, No, he's just saying, he's saying that the complaint or the indictment is bare bones and that the two witnesses that you offered added nothing to it. And consequently, before the district court, it had no basis, no credible and cognizable basis to declare these funds tainted. Well, first, I will say one thing. The court said, first of all, that even if we were to presume that, and this falls short of the law, if we were to presume that this case was a weak government case, okay, and I will go back to the statutory prerequisites under 983, we're not entitled to prove our case and our pleadings. We plead facts, we don't plead the evidence. But assuming for the sake of argument that we did have a weak government's case, which we don't, that that is not something that the court considers when it's looking at disentitlement. That goes unto Smith v. Varney, and this is exactly what I'm talking about. The Smith-Varney court basically said, and it touches on other cases as well, that the merits of the government's case is irrelevant to disentitlement. It goes back to the Supreme Court's in 89 firearms saying a conviction  is not dispositive of a civil forfeiture action. So the court said basically, you know, even if these documents said what you say they do and they don't on their face, then it still doesn't, you know, militate in favor of reconsidering my finding that you're a disentitled fugitive. You're getting away from the question I thought I asked you. And their argument that starting with the beginning that the complaint does not support the forfeiture because it does not state sufficient facts, so there's no evidence that supports the alleged corruption that is the basis of the forfeiture. Yeah, and first I want to they never really challenged the factual allegation. What they did was in their first motion to strike, they challenged the complaint because it didn't allege the violations of Mexican law that we were referring to. I know, but this morning he made the claim that the government has evidence to support the corruption that underlies the taint of the Bermuda Farts. If you're asking if the government has evidence,   Well, the Bermuda Farts claim that the government has evidence Once he was disentitled, the government will not Well, he's not disentitled. At the time that he was requesting it Well, I mean, he's disentitled. Yes, he is disentitled by not showing up. But what you're then saying is that he doesn't have the right to question the sufficiency of the evidence. That's exactly right. He doesn't know He is saying No, that's right. He doesn't have the right to question himself. He's just simply saying not my evidence. I'm not challenging your complaint with my evidence. I'm just saying you haven't alleged bare bones evidence, and you've got to do that. You can't just come in and say he's got money and I want it. You've got to allege a basis for it. I agree, and Your Honor, the complaint that we filed is not a bare bones complaint. It alleges the transactions are what transpired in Mexico. It outlines what happened in Mexico, what he was doing, and then it enumerates. It's like paragraphs 4 through 19 identify the financial transactions and that occurred with that money through the United States banks into the Bermuda account. It is not a bare bones complaint. What does it say about the taint and corruption of the money? Why is this money ill-gotten gains? What does the complaint say about that? This money, going back, I don't have the complaint in front of me, but from my recollection, is that what happened was it began before his election in 2007, and he was elected mayor in 2007, and during the campaign, this corruption began by him taking campaign contributions from certain individuals or companies, and then after he was elected, on the premise that he would then award them public works contracts, and after he was elected mayor, and this is kind of where the banking activity kind of intertwines with it, because we talk about what he had in his account, some monies that he had in his account, immediately before he was elected, and then what happened during the time he was elected and how those accounts grew. The complaint alleges that after he was elected, he awarded these public works contracts avoiding a bidding process. The state of Tamaulipas has a bidding process that they have to go through in order to award contracts, so we allege that the bidding process was not followed, and then on top of that, he awarded contracts either to companies that existed only on paper, and when he did award contracts to those companies that he  towards, he was given a kickback for giving them the award of the contract. I think there's a little bit more, but I'm just from the top of my head. One of the things he raised at the end of his argument was the question about why these aren't uniquely Mexican interest, because everything you just described are all things that you allege happened in Mexico. Exactly, and our money laundering laws interdict with the financial movement of that money from Mexico into the United States, and his case is not unique. I can cite to, in footnote 8 of page 30 of my brief, I refer to a case, Judge Nelva Ramos of the Southern District of Texas Corpus Christi. On August 15th, she disentitled an individual, granted a default judgment on facts almost identical to this one, almost identical. There was one distinction that complaint alleged, in addition to the money laundering violation predicated on the foreign law violations. He was also charged with committing bank fraud. He was charged with lying to the bank about the source of his funds, which were the illegal funds that he had paid for Mexico. Those funds were moved to the Bermuda account. He remained a fugitive in Mexico. His wife was a claimant. She was struck for sanctions, and at the end, the court granted a default judgment of forfeiture, and that happened on August 3rd of 2015, almost under identical facts. He was a foreign Mexican national from the state of Tlaquihila. He was the mayor of Saltillo. He had been the secretary of finance. So the short, I guess, response would be it's not a uniquely Mexican interest because the money was put into American banks? Is that what you're telling me? Exactly. I mean, there's other cases that, beyond this one, I mean, we've got, you know, there's numerous cases that were cited in the brief by both sides that involve, you know, foreign nationals with banks, with monies and accounts all over, not just in one country but in several countries. It's not a unique circumstance, and it's exactly why. And if you look at one Gulfstream jet, which talks about, it's active state international comedy, and it talks about Congress's specific purpose of expanding the predicate, you know, foreign criminal activity when it went under in 2000 when they, under the Patriot Act. And it talks about why they enlarge it. And basically it was, we are offended that these foreign nationals are using our U.S. banking and financial institutions to launder their dirty proceeds, and they enlarge the number of crimes, and it included the specific crimes that he was, that he has been alleged to have committed. Beginning, I want to go back a little bit. So the court has talked about these documents, and I have these documents if you want to take a look at them. I've got three sets of copies with their translations. And I can tell you specifically that if you look on the face of these documents, on the face of these documents, they do not say what he says they do. He claims, the first thing that, you know, here today, again, the very first document is this declaration, basically it's a certification from the Municipal Electoral Council that says the votes were counted, these people of the pre-party were the ones that won, and were certifying the election. It doesn't say their use of campaign funds were transparent. It doesn't say, you know, that they followed all proper procedure. It basically says the votes were counted, the official vote says these people won, boom. That's it. That's it. The next set of documents, it's a, it's something equivalent to what we would get from the IRS. It basically says he filed his tax returns, he paid monies on the tax returns that he, it doesn't even make, it doesn't even say that he declared all of his, the declaration of his income was correct. It would have been more compelling, Your Honors, if he had submitted the tax returns to show what the sorts of those funds were. Maybe that would have been a more compelling circumstance for the court to consider whether or not to reconsider its motion for disentitlement. It's a clearly erroneous fact-finding standard. The court, in order for this court to find that the judge abuses discretion, you would have to go back, these documents are pivotal, and you have to go back, and when you do, and you look at these documents for what they are, what they say on their face, his description of these documents as being officially exonerative, an official declaration by Mexico that I have committed no crime, his characterization of these documents is beyond pale. And he's asking the court to find that Judge Crane abused, and it wasn't a summary dismissal. The judge thought about them, and he discusses them. The one thing that the judge did not discuss, and I wish he had discussed it further because it's significant, was the government's interest. It's not just where the government, the United States, brings a cause of action and files a lawsuit, criminally or civilly. What the government the government's, the real gravamen of the government's interest in this is, again, going back to Congress, is the prevention of the use of our financial institutions for foreign nationals to use our banks as a clearinghouse. And that's that is the real purpose and policy that overrides the act of comedy and act of state, even if you were to find that any of those documents could warrant such a consideration. But not only that, the purposes and the principles of comedy and act of state are that if they do, if those circumstances do exist, then the proper thing to do is to dismiss the case. It's their prudential deference of jurisdiction. They abstain from exercising the jurisdiction so that the other foreign country can resolve the issue or the dispute. It's not a reconsideration of disentitlement so that somebody can, so the suit can go on. That would contravene the whole purpose of the doctrines. It's just, it makes no sense. But he doesn't want the case to be dismissed under doctrine of state or international comedy or state because he wants the government's evidence. This case has always been about getting the government's evidence. And when a person is disentitled, litigation ends. It ends. We're over. There is no merits inquiry. There is no discovery because, again, the only way to rebut that presumption is to show up in the criminal case. That's exactly what Judge Crane said. Come back and talk to the court down the hall. At the same time, it doesn't mean that the government can be relieved of its duty to at least prove up its case to the satisfaction of the district court. I agree. In other words, you haven't been disentitled. No. I absolutely agree. You still have an obligation. You're exactly right. And what is that obligation? Once a fugitive has been disentitled, and the case that I think is the most instructive on this, to your honors, would be U.S. v. $85,000, I believe it's out of the Southern District of Maryland or Northern District of Maryland. That case is instructive as to what happens when an individual has been disentitled, and you're looking at a default judgment of forfeiture. Again, the whole thing is that the person, and again, it dovetails into Rule 55, a person who is disentitled is presumed to have waived their defenses and abandoned any claim to forfeiture. So that, basically, you are, it dovetails right into, the only inevitable result of that is going to be a default situation, and that's discussed in, it's discussed in a... If they are disentitled, if you find they are disentitled, then the government has a basic obligation to show that it followed the correct procedures in terms of obtaining the default. Yes. But he has no obligation, he has no right whatsoever to challenge the default judgment. That's correct. He's got no, he's got, I'm just addressing the Court's question, but under, go back to Ortega-Reed, he has no right. Once he is disentitled, and if this Court should affirm and should affirm the District Court's finding that he is disentitled, then he has no right to challenge the appeal beyond that. None whatsoever. None whatsoever. But, I'm not saying that doesn't relieve the government's burden, and the Court correctly found that we met our burden. We still have to meet, we look to Rule Supplemental Rule G, we look to Rule 983, and I will say, I cannot say this strong enough, we do not have to prove our case by a preponderance of the evidence in order to obtain a default judgment. Why? It's like every other default situation. What do you do? You look to the pleadings, and the concerns that Mr. Silva has about government overreaching were addressed by Congress again with the Patriot Act when it required that the government be held to a heightened pleading requirement under Supplemental Rule G. Our pleading requirement goes beyond Rule 8. We have to plead specifically detailed facts to establish that we will be able to meet our burden of proof at trial by a preponderance of the evidence that the circumstances are justified under statute and that there is a substantial connection between the property and the criminal underlying criminal activity so that forfeit would be appropriate. And that's exactly what Judge Crane did. He found when the default was entered that we've served everybody, that's the first thing we need to do is show publication. We have to serve all interested parties. We met that requirement. The next thing we have to do is we have to show, we have to establish through our pleadings that they are specifically pled and we meet the Supplemental Rule G 2F standard. And then beyond that, and the Court, and Rule 55 default is still discretionary. The Court still has to determine whether those facts that are alleged that are deemed to be true establish that substantial connection. And Judge Crane also made that finding when he found that the monies that he gained from the kickbacks and the conduct in Mexico were brought into the U.S. banks and moved through the U.S. banks to the Bermuda account. That is your substantial connection. It exceeds the prior nexus standard. That's no longer, we have a higher burden in that regard. We have to show a substantial nexus. But we do not have to prove with our pleadings by a preponderance of the evidence. So I will tell the Court there are cases, and there are some in our district also, what the courts should be finding is that we, in a default situation, a forfeiture, is that we, the Court, find that the government has met the publication requirements, the pleading state and sufficiently detailed facts that, you know, that the government has, can meet its burden of proof at trial, and that there is a substantial connection between the criminal property and the underlying crime. So that forfeiture is justified. Okay. Thank you. Thank you, Ms. Smyth. Mr. Arvin. Your Honors, Ms. Smyth started her presentation talking about fugitive disentitlement and the purpose of that doctrine in the statute as showing fugitives that had a disrespect of the process. If you look at the record, and I'm alluding to page 707 of the record, Mr. Silva offered to come to the United States to answer the charges in the criminal case. It's my understanding that he asked to be released on bail to fight his case, and the government said no, and there was no agreement that could be reached. So what happens? If he's going to come to court to answer his charges, he is going to be incarcerated. And what free man who's living his life in Mexico, who was the former mayor, is going to want to do that? I agree. And I think Judge Crane agreed to that as well. And that's precisely the issue here. Now, wait. Maybe I'm not familiar. What is the issue now? He doesn't want to go to jail? Of course he's staying in Mexico. Of course he doesn't want to go to jail. Of course he wants to see the discovery. That's exactly what this case is about. He has been charged. He wants to know what the evidence is in front of him. But he can come and find out. He could come and find out, and then he would be incarcerated. And that's the decision that Mr. Silva has to make. But it's a decision that it doesn't need to be that way, given these circumstances, if the district court determines that the fugitive disentitlement statute does not apply. You're right. He would be incarcerated if he came in now because he's been a fugitive. He would be incarcerated. Fugitives don't usually get bond. That's exactly correct, Your Honor. And that is where he is staying afar, but under the discretionary standing. He came in and answered the charges immediately, and he probably obtained bond. I don't know. They might say that he presents a flight risk. I don't know what would have happened. The fact is, we are where we are today. And Mr. Silva has repeatedly asked for discovery. He's repeatedly asked to learn about what this case is about. And if you look at the complaint, apart from two conclusory paragraphs which talk about, you know, there's a scheme that exists, and, you know, there are these skeleton companies. There's no They filed a complaint in Forfeter, right? Correct. And it made various and subject allegations about corruption and how his personal bank accounts had swollen after he became male, and various other allegations about robbery and kickbacks and so on. And I suppose that you answered it and you denied it, is that right? Correct. And so you have nothing here but just the denials. I mean, he didn't file any affidavits. Nobody's filed any affidavits challenging specifically any of the allegations that he's made. No effort has been shown, I suppose, to show how his bank accounts went up to $2 million or more on a salary of $100,000 or so on. I mean, there's no effort to try to really challenge the essence of the corruption. There was a joint scheduling order entered in that case. The parties planned to conduct discovery, just like any other civil litigation. There were planned to be depositions. There was planned to be an exchange of discovery. And then the government brought the hammer down and said, you are disentitled as a fugitive. And we submit that that... Well, that shouldn't have been a surprise to you. It may not have been a surprise, but again, the standard talks about discretion, and we think that quite frankly, we thread the needle in this case. If there is a case that calls for exercise of that discretion, this is the one. Now, the government bears the burden under CAFRA to show that the property, the Bermuda Bank account, should be forfeited. And the district court here abused its discretion by shifting the burden. So, I just want to say one other thing about the Mexican documents. They say what they say, and you have them in the record. If I here was an innocent person, and I wanted to get some proof of my innocence, some proof saying, hey, the government's not investigating me, I think it would be very, very difficult to find a document to say that. But Mr. Silva tried to do that. That's what he tried to do, because he believes that he's innocent, he's been a law-abiding citizen in Mexico, and why is this American judicial system getting involved in his business? So he tried to do exactly what he was supposed to do, which is try and come up with evidence to show to the district court that it should not disentitle him. I see my time is done. There's no question. I mean, the disentitlement is a tough statute. That's correct, Your Honor. Thank you. Okay. I thank each of you for the arguments. Thank you.